JOHN P. BAILEY et al. *vs.* J. W. FUQUA et al.

By the provisions of the common law, the State has no lien upon the personal property or choses in action of the tax payer for the amount of taxes due by him. *Anderson* v. *The State*, 1 Cushman, 459, cited and confirmed.

The revenue laws of the State provide expressly for a lien upon real estate for taxes due, but.do not give any lien upon personal property or choses in action.

The term "*ad valorem* tax," in the revenue laws of this State, means a tax or duty imposed on the value of the article or thing subject to taxation, and has no other meaning.

The legislature intended to make a distinction between a "specific" and "*ad valorem*" taxes; consequently, it was not their intention, in levying a tax on the Commercial Bank of Manchester, to tax the amount of the bank stock, regardless of its real numerical value.

The bank was not liable to any other tax for the years from 1841 to 1847 inclusive, than what had already been paid by it; but the bank shall not be repaid by the State the amount of taxes heretofore collected from it by the State.

ON appeal from the superior chancery court; Hon. Charles Scott, chancellor.

The Commercial Bank of Manchester was incorporated in 1836; and the bank has regularly paid its taxes, at the rate of 1-4 one per cent., upon its entire amount of capital stock until 1842. From that time forward, the stock was assessed under the revenue act of 1841 and 1844 at its supposed cash value, and the taxes paid on its stock accordingly, at the rate of sixty cents to the dollar. In estimating the value of the stock, the bank counted its cash, bills receivable, judgments, and all other evidences of debt, together with its real and personal estate. It has, in addition, paid taxes on its real and personal estate *eo nomine*. The bank was under *quo warranto* injunction, as stated in the bill filed, which was the foundation of this suit. On the 17th of October, 1845, the bank transferred by deed of conveyance in trust to the complainants, all its property of every description, both real and personal, as well as its evidences of debt.

The assessments of the stock of said bank were made annu-

ally from 1842 to 1847 inclusive, and the stock estimated and assessed at sixty cents to the dollar. In 1848, the sheriff and tax collector of Yazoo county (Fuqua), without any assessment for said years, demanded of the bank what he considered a deficit of taxes remaining unpaid; and then, in 1848, undertook to assess the taxes claimed to be due for 1842 and to 1847 inclusive, but which were unassessed for those years, and claimed that the bank should pay taxes on the remaining forty cents to the dollar of its capital stock, which was refused, and the sheriff levied on property which had been conveyed to complainants in 1845. To prevent a sale, an injunction was sued out.

*Miles* and *Geo. S. Yerger*, for appellants.

*D. C. Glenn*, attorney-general, for appellees.

Mr. Justice YERGER delivered the opinion of the court.

The facts agreed in this case are as follows, to wit:

The Commercial Bank of Manchester was incorporated in 1836. The bank paid its taxes regularly, at the rate of 1-4 of one per cent., upon its entire amount of capital stock, until 1842. From that time forward, the stock was assessed under the revenue acts of 1841 and 1844 at its supposed cash value, and the taxes paid on its stock accordingly, at the rate of sixty cents to the dollar. In estimating the value of the stock, the bank counted its cash, bills receivable, judgments, and all other evidences of debt, together with its real and personal estate; and has, in addition, paid taxes on its real and personal estate *eo nomine*. The bank was under *quo warranto* injunction for several years, as alleged in the bill. On the 17th day of October, 1845, the bank transferred, by deed of conveyance in trust to the complainants, all its property of every description, both real and personal, as well as its evidences of debt. The assessments of the stock of the bank were made regularly annually from 1842 to 1847, both inclusive, and the stock estimated and assessed at sixty cents on the dollar.

In 1848, the sheriff and tax collector of Yazoo county, with-

out any assessments for three years, demanded of the bank what he alleged was a deficit of taxes remaining unpaid; and then and there, in 1848, undertook to assess the taxes so claimed to be due for 1842 to 1847, but which he alleged were unpaid for those years, and demanded that the bank should pay taxes on the remaining forty cents to the dollar of its capital stock. This was refused, and the sheriff levied on certain real estate that had been conveyed by the bank to complainants in 1845. To prevent this sale, an injunction was obtained; which injunction was dissolved, and the bill dismissed, by the chancellor.

On this state of facts, two questions arise. First. Are any taxes due to the State from the Commercial Bank of Manchester for the years 1842 to 1847, both inclusive? Second. If so, has the State any lien on the property assigned by the bank in October, 1845, to the complainants?

In reference to the second question, it may be remarked, that this court decided, in the case of *Warren P. Anderson* v. *The State of Mississippi et al.* 1 Cushman, 459, that the State had no lien, by the provisions of the common law, upon the personal property or choses in action of the tax payer for the amount of taxes due by him; and that the revenue laws of 1841, 1844, and 1846, which expressly provided for a lien upon real estate, did not give any lien upon personal property or choses in action; and that a *bonâ fide* transfer thereof, before a levy upon them for the taxes, would be sustained against the claim of the State. In the case before us, the levy which the State has made for the taxes alleged to be due is upon the real estate assigned by the bank to the complainants in 1845; and it is alleged that the State has a lien upon that, although it has none upon the personalty.

The revenue laws of 1841, 1844, and 1846 expressly provide that a lien upon all the real estate of the tax payer shall be retained by the State, "in preference to all judgments, executions, incumbrances, and liens of any description whatsoever; and that the taxes shall be, from the 1st day of March in each and every year, a lien upon all the real estate of the person assessed within the county in which the assessment is made."

Without pretending to decide, or even to intimate an opinion, that this lien can possibly exist until it has been fixed by an assessment of the debtor's property for the taxes due by him in each and every year, we proceed at once to investigate the main question presented by this record. Is there any thing due to the State for taxes by the bank for the years 1842 to 1847, both inclusive?

In the year 1836, the Commercial Bank of Manchester was incorporated; and by the 10th section of its charter, the State reserved the right to " assess a tax on the capital stock not exceeding twenty-five per cent. on each share of stock subscribed," exempting the bank from taxation for twelve months succeeding its organization. In the year 1838, the charter of the bank was amended, and the stock reduced from twenty to ten thousand shares of $100 each.

On the 15th day of February, 1838, a statute was enacted, which provided that a tax of twenty-five per cent. per share should be levied upon the stock of all banks *liable by their charter to taxation.*

Thus stood the law until the year 1841. By section 1 of the revenue law of that year, Pamphlet Acts, page 51, it is declared, that the following taxes shall be assessed and collected within this State, namely, an *ad valorem* tax of one fourth of one per cent. on all lands in this State, not exempted by the ordinance admitting the State into the Union, or specifically exempted by the provisions of this act; on all money loaned at interest by individuals, or employed by them in the purchase of notes, bonds, checks, or bills of credit of any description whatever, as security for money advanced; on all goods, wares, and merchandise, sold by regular merchants; on all bank stock subscribed for in any incorporated bank in this State, which shall not have paid a bonus for its charter, or have been exempted from the provisions thereof, except stock subscribed for and owned by the State, or some incorporated literary or charitable institution."

The revenue acts of 1844 and 1846 contain similar provisions to the above, only varying the amount of the tax from one fourth of one per cent. to three tenths of one per cent. By the case

agreed, it will be seen, that in each and every year from 1841 to 1847, both inclusive, the stock of the Commercial Bank of Manchester was valued, and the rates of taxation fixed by the several revenue laws in force from time to time, paid on the assessed value of the stock.

For the complainants, it is contended, that the taxes so paid by them on the value of the bank stock, was all that the bank was by law liable to pay, and that there is nothing now due the State. For the State, it is urged, that the assessment of taxes should have been upon the numerical amount of the capital stock of the bank, and not upon the real value thereof, and that the bank is still liable to pay according to that mode of assessment.

It is certainly true, that at the time the revenue acts of 1841, 1844, and 1846, were passed, the legislature had the power to have levied a specific tax of twenty-five cents on each share of $100 of the capital stock of the bank, regardless of the value thereof, in the same manner as specific taxes could have been levied on any other article subject to taxation. But while this power existed in the legislature, it was a power which they had a discretionary right to decline exercising. The sole question for us, as a court, to try, is not whether the legislature should or should not have exercised the power of levying a specific tax on each share of the capital stock, but whether a specific tax on each share of that stock or an *ad valorem* tax on the value of each share of the capital stock, has been directed by the legislature. If we accept the literal interpretation of the language used by the legislature, no doubt can possibly arise in the mind of any one. The language of the act is, that there shall be assessed and collected within this State, " an *ad valorem* tax of one fourth of one per cent. on all bank stock subscribed for in any incorporated bank in this State," &c. The term " *ad valorem* tax " is as well defined and fixed as any other used in political economy or legislation, and simply means a tax or duty upon the value of the article or thing subject to taxation. The language used by the legislature in this law should receive the same construction as if it had declared, that " there shall be assessed and collected within this State a tax of one fourth of

one per cent. on the value of all bank stock subscribed for in any incorporated bank," &c. Had this language been used, no doubt would have arisen in the mind of any one. Yet the language used by the legislature, to wit, " an *ad valorem* tax," &c., has the same precise and identical signification, and none other.

Is bank stock subject to valuation ? Has it always a fixed price in the market, according to the numerical amount, or does it fluctuate and vary in value like any other commodity ? Our daily observation and knowledge enable us to answer these questions as readily as we could answer whether real estate or slaves have a fixed and permanent price and value, or are subject to change and fluctuation in price. But it is said, that by the phrase, " bank stock," the legislature intended the " capital stock of the bank ; " and as that stock is fixed in amount, the tax should have been levied on the whole amount of the " capital stock" of the bank, and not upon its value. While we are willing to concede the position, that the legislature, by the term " bank stock," intended the " capital stock of the bank," yet the deduction contended for would not, in our opinion, follow from the premises. To test this, let us insert into the law the expression, " capital stock of the bank," in lieu of " bank stock," used by the legislature. The law would then read, that " there shall be assessed and collected within this State, an *ad valorem* tax of one fourth of one per cent. on the ' capital stock ' subscribed for in any incorporated bank," &c. It will be seen at once that we must reject the words, " *ad valorem*" entirely from the law, as useless and unmeaning, before we could construe the law to mean a specific tax " on the amount of the capital stock," instead of a tax upon the " value of the stock." We cannot do such violence either to the language, or to the plain and manifest intention of the legislature. We are bound to presume that the legislature knew the definition of the language and terms used by them ; and it is our duty to give effect to the language they employed. If it were necessary to show by any other reasoning than from the words used by the legislature, that it was intended by them to assess a tax on the value of the bank stock, and not on the

Bailey et al. *v.* Fuqua et al.

mere numerical amount, regardless of its value, that fact, it seems to us, would appear conclusively from two things. First. In the same section in which the *ad valorem* tax is laid on bank stock, land, &c., the legislature has laid a specific " tax of one cent upon each head of cattle, over the number of twenty, of $500 on' billiard tables, and seventy-five cents on each and every slave between the ages of five and sixty." Thus showing that the legislature intended to make a distinction between specific and *ad valorem* taxes, and used the language necessary and proper to make that distinction.   Secondly. In 1838, when the legislature provided for the taxation of bank stock by a specific tax per share, instead of a tax upon the value, they used the proper language for that purpose, so as to leave no question as to their intention. Thus, in the act of 15th February, (Pamphlet Acts, 176,) it is enacted, " that all bank stock in this State be, and the same is hereby taxed twenty-five cents on every hundred dollars," &c.   The studious introduction of the term *ad valorem* in subsequent laws taxing bank stock, and not using it where specific taxes are laid on other things, shows clearly and un-. questionably, a change in the policy of the legislature in taxing that kind of property.   Whether this change of legislative policy was judicious or not, is not our province to determine. It is sufficient, so far as the judiciary is concerned, for us to declare that such is the law of the land, as enacted by the legislature, and to adjudge accordingly.

It may not be improper to remark, however, that most probably the legislature, in their changing their policy on this subject, was governed by the consideration that a great commercial revolution had taken place, by which the value of all kinds of property was materially changed and affected, and that justice and equal legislation required, that the individual who had invested his money in bank stock, which might have declined in value, should only be assessed and taxed upon the value, and not the mere number or amount of his shares, in the same manner that those who had made investments in land were only required to contribute to the taxes according to the value of the land, and not the number of acres owned.

We are, therefore, of opinion, that the Commercial Bank of

Manchester was not liable to any other taxes for the years 1841 to 1847 inclusive, than had already been paid by it; and that the chancellor erred in dissolving the injunction and dismissing the bill. We, therefore, reverse his decree, and direct that a decree be prepared perpetuating the injunction, according to the prayer of the bill; but disallowing the prayer of the bill, to be repaid by the State on account of taxes heretofore collected.